[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2011
JOHN LEY
CLERK

_____

No. 09-14977

_____

D. C. Docket No. 01-00011-CV-1-SPM-WCS

JOSE ELIAS SEPULVEDA,

Plaintiff-Appellee,

versus

RALPH W. BURNSIDE, et al.,

Defendants,

FLOYD GIPSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 24, 2011)

Before CARNES, KRAVITCH and FARRIS,[*] Circuit Judges.

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:

Jose Sepulveda, a former inmate at the Alachua County Correctional Center (ACCC), sued Detention Officer Floyd Gipson under 42 U.S.C. § 1983 for retaliation under the First Amendment and deliberate indifference under the Eighth Amendment after he was attacked by another inmate. A jury found in favor of Sepulveda and awarded $1 in compensatory damages and $99,999 in punitive damages. In this appeal, we must determine whether the district court properly denied Gipson's motion to set aside or reduce the punitive damages award issued against him. Because we conclude that the district court did not sufficiently explain its reasoning under *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408 (2003), in denying Gipson's motion, we vacate and remand.

In 2001, Sepulveda filed a *pro se* amended complaint against Gipson for deliberate indifference under the Eighth Amendment, harassment and retaliation under the First Amendment, and various state law claims for the injuries he sustained in February 2000 during an attack by fellow inmate Donald Small.[2]

_____

[2] Sepulveda also named as defendants ACCC Detention Officers Allen and Eliott, U.S. Marshal Ralph Burnside, Alachua County Sheriff Stephen Oelrich, and ACCC inspector Alan Morrow, raising claims under 42 U.S.C. §§ 1983, 1985 and 1986, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1991), and state law. The district court granted summary judgment to all defendants on all claims except one claim of retaliation against Eliott. After a trial, the jury returned a verdict for Eliott. Sepulveda appealed. This court affirmed in part and reversed in part, concluding that summary judgment in Gipson's favor on the First and Eighth Amendment claims was not warranted. A full recitation of the allegations against Gipson can be found in our earlier decision. *Sepulveda v. Burnside*, 170 Fed.

At trial, Sepulveda testified that from the time he first entered ACCC in 1997, he encountered racist comments and discrimination. Although he was a federal prisoner housed at ACCC temporarily, he was placed in a special management unit. He stated that he was denied access to the law library, left in shackles for over 24 hours, denied access to medical care, and retaliated against because he filed grievances about the manner in which he was treated. He eventually filed suit against eight detention officers at ACCC in connection with these incidents. After that, Gipson, who knew of Sepulveda's grievances and lawsuits, began to call him a snitch, knowing it was a very dangerous label in custody.

Sepulveda further testified that in November 2000, Gipson arranged for Sepulveda to be attacked by fellow special management inmate Donald Small when he permitted both Small and Sepulveda to be in the common area with two metal chairs at the same time. Once Small attacked Sepulveda, Gipson did not stop it or try to intervene until another officer arrived on the scene. As a result of the attack, Sepulveda stated that he now wears a hearing aid.

Sepulveda's ex-wife and parents testified that they had called prison officials to complain that Sepulveda was denied access to medical care and had been left

---

Appx. 119 (11th Cir. 2006) (unpublished).

3

shackled overnight. They alleged that prison officials had called Sepulveda "snitch" and "taco boy." They stated that Sepulveda did not wear a hearing aid prior to the attack.

Frank Merold, a former inmate who had been placed in the special management unit around the time of the attack, explained that the unit housed violent inmates and that he had overheard Gipson and others in the unit refer to Sepulveda as a snitch for suing various detention officers. Merold explained that calling an inmate a snitch could be very dangerous. Merold also stated that it was common knowledge that Sepulveda had filed a lawsuit against a number of ACCC corrections officers.

Gipson testified that he had been an officer at ACCC for about fifteen years and had worked the special management unit for about a year. He explained that Sepulveda and Small had requested haircuts and because there were two barbers on duty on the day of the attack, he permitted both inmates to be released from their cells at the same time to expedite the process. The inmates were not handcuffed or shackled at the time because an inmate would not usually be shackled while getting a haircut. He admitted that he had violated ACCC policy by releasing two inmates simultaneously, but stated that he had no malicious intent. Gipson testified that only Small, Sepulveda, and he were in the common area when he observed Small

4

strike Sepulveda with his fist. He called a Code Red and positioned himself between the inmates until Officer Mavin arrived and removed Small from the common area. According to Gipson, he tried to protect Sepulveda. Gipson admitted that he had a duty of care and that he breached that duty, but he denied acting in retaliation for the grievances and lawsuits Sepulveda had filed. He explained that it was fairly common for inmates to write up or sue officers. When asked about labeling Sepulveda as a snitch, Gipson stated that the term did not have the meaning or connotation it would have in a state prison environment; in ACCC it had no real significance. Nevertheless, Gipson denied calling Sepulveda a snitch. He also denied talking to Small about Sepulveda or having any knowledge of Small's mental health status. Gipson further testified that he had observed Sepulveda and Small interact in the unit and had not seen any issues. He stated that Sepulveda never complained that Small threatened him and he had no information to believe that Small posed a threat to Sepulveda.

Sepulveda submitted ACCC's policies and procedures to establish Gipson's violations. Under ACCC's policies and procedures, special management inmates were to be shackled and handcuffed whenever removed from their cells. Only one inmate was to be removed at a time, and the inmate was to be accompanied by two officers while out of his cell. Generally, ACCC would bring in only one barber at

5

a time to attend to inmate haircuts on the special management unit, and only one inmate could be released from his cell at a time to receive a haircut.

Sepulveda also submitted the incident report for the February 2, 2000 attack. According to the report, Small struck Sepulveda with a chair, once on Sepulveda's back right shoulder and once on his right upper arm. Small also struck Sepulveda in the head with his fist before Gipson was able to subdue Small. Sepulveda was given medical attention for bruises and lacerations on his back and right bicep. Sepulveda also complained of hearing loss in his left ear.[3] During a subsequent investigation, Sepulveda informed the investigating officer that Small had been making racial comments in the week preceding the attack. Following the attack, Gipson was disciplined for violating prison policies; he received a one-day suspension without pay.

After the parties rested their cases, the court instructed the jury, *inter alia*, that, to prevail on his Eighth Amendment claim, Sepulveda had to prove that Gipson intentionally violated Sepulveda's constitutional rights under the Eighth Amendment, which prohibits cruel and unusual punishment. The court explained that there had to be deliberate or intentional conduct by Gipson and not mere

---

[3] Other than his own testimony and that of his family, Sepulveda did not submit any medical evidence. In the documents attached to the amended complaint, there was a medical consultation from November 2000 showing some hearing loss and a notation from January 2001 recommending a hearing aid. But Sepulveda did not seek to admit these documents at trial.

6

negligence. Addressing damages, the court explained that the jury

> should assess the amount you find to be justified by a preponderance
> of the evidence as full, just, and reasonable compensation for all of the
> plaintiff's damages. Compensatory damages are not allowed as a
> punishment and must not be imposed or increased to penalize the
> defendant. Also compensatory damages must not be based on
> speculation or guesswork because it is only actual damages that are
> recoverable. On the other hand, compensatory damages are not
> restricted to actual loss of time or money; they cover both the mental
> and physical aspects of injury – tangible and intangible . . . . You
> should consider the following elements of damage to the extent you
> find them by a preponderance of the evidence, and no others. (a)
> emotional pain and mental anguish; (b) punitive damages, if any; (c)
> nominal damages. The plaintiff also claims that the defendant's acts
> were done with malice or reckless indifference . . . so as to entitle the
> plaintiff to an award of punitive damages in addition to compensatory
> damages. In some cases punitive damages may be awarded for the
> purpose of punishing the defendant for its wrongful conduct. So an
> award of punitive damages would be appropriate only if you find for
> the plaintiff and then further find from a preponderance of the
> evidence that defendant personally acted with malice or reckless
> indifference to the plaintiff's federally protected rights. If you return
> a verdict for the plaintiff . . . but find that he has failed to prove by a
> preponderance of the evidence that he suffered any actual damages,
> then you may return an award of nominal damages not to exceed one
> dollar. Nominal damages may be awarded when a plaintiff has been
> deprived by the defendant of a constitutional right but has suffered no
> actual damages. . . .

The jury found in favor of Sepulveda and awarded $1 in compensatory

damages and $99,999 in punitive damages.

Following the verdict, Gipson moved to set aside or reduce the punitive

damages award, which is the subject of the instant appeal. Gipson argued that the

7

punitive damage award was unconstitutionally excessive and violated due process. Citing the three *BMW* guideposts, the district court denied the motion, explaining that (1) the jury had found that Gipson had engaged in "very serious and reprehensible conduct" that violated Sepulveda's rights and caused him physical harm; (2) there was no mathematical formula to evaluate the reasonableness of awards and "it was reasonable for the jury to have awarded $99,999 as punishment for the Defendant's decidedly reprehensible actions"; and (3) the amount was not excessive compared to amounts awarded in other personal injury, tort, or negligence cases. Gipson now appeals.

We review the constitutionality of a punitive damages award *de novo* and factual findings for clear error. *Cooper Indus. v. Leatherman Tool Grp.*, 532 U.S. 424, 436 (2001).

Federal due process prohibits a state from imposing a "grossly excessive" punishment on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454 (1993). In determining whether a punitive damage award is unconstitutionally excessive, this court must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference

8

between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).[4] We consider each of these guideposts in turn.

### a. Degree of Reprehensibility

This guidepost is considered to be the "most important" indicator of the reasonableness of the damage award. *State Farm*, 538 U.S. at 419. There are five specific factors that courts consider when determining the degree of reprehensibility:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

---

[4] In this circuit, the "[p]roper due process analysis of a punitive award . . . requires first that we identify the state's interest in deterring the relevant conduct and the strength of that interest. Next, we review the district court's findings regarding the three *BMW* guideposts." *Myers v. Cent. Fla. Inv., Inc.*, 592 F.3d 1201, 1218 (11th Cir.) (citation and quotation marks omitted), *cert. denied*, 131 S.Ct. 299 (2010). The district court made no findings concerning the state's interest. Nevertheless, it seems obvious that the state has a strong interest in deterring abuse of prison inmates by prison officers. *See Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (explaining that prisoners have a constitutional right to be free from violence while in custody); *cf. Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) ("This court takes police brutality very seriously as grounds for punitive damages . . . . The need to deter such behavior is plain: police brutality is a longstanding problem with which many cities are still coming to grips."). The state also has a "legitimate interest[] in punishing unlawful conduct and deterring its repetition." *BMW*, 517 U.S. at 568.

538 U.S. at 419; *see also Goldsmith v. Bagby*, 513 F.3d 1261, 1283 (11th Cir. 2008) (citation omitted). Although there is no requirement that a certain number of the five *State Farm* factors be present to support a finding of reprehensibility, reprehensibility grows more likely as more factors are present. *See State Farm*, 538 U.S. at 419.

In this case, the district court did not specifically analyze the five factors, but considering the factors and in light of the jury's verdict, it appears that this reprehensibility guidepost weighs in favor of Sepulveda. First, there can be no dispute that the harm caused was physical as opposed to economic. Second, the jury was instructed that to find in Sepulveda's favor, it had to conclude that Gipson acted with indifference to or a reckless disregard of the health or safety of others. Third, although Sepulveda was not financially vulnerable, he was vulnerable as an inmate housed in the special management unit and he relied on ACCC policies to protect him from other inmates. Finally, although the attack was an isolated incident, the harm that could have occurred was great. And although Gipson testified that he simply made a mistake, the jury necessarily disbelieved him when it awarded damages, indicating that his conduct was more than mere accident or negligence.

b. Ratio

The second guidepost considers the "ratio" between compensatory and punitive damages, which requires that the punitive damages award be "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (quotation marks omitted). The "proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *BMW*, 517 U.S. at 58 (citation and quotation marks omitted) (emphasis in original). "[C]omparison between the compensatory award and the punitive award is significant." *Id.* at 581 (citations omitted). In particular, the ratio of punitive to compensatory damages is instructive. *See State Farm*, 538 U.S. at 425. Nevertheless, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *BMW*, 517 U.S. at 582 (citation omitted); *see also State Farm*, 538 U.S. at 425; *Goldsmith*, 513 F.3d at 1283. And although the Supreme Court has held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425, the Court also has recognized that "low awards of compensatory damages may properly

11

support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *BMW*, 517 U.S. at 582; *see also State Farm*, 538 U.S. at 425.

Here, the jury awarded $1 in compensatory damages and $99,999 in punitive damages.[5]  In denying Gipson's motion to reduce the award, the district court made no factual findings to support its conclusion that the amount was reasonable.  Nor did the court discuss any of the relevant cases.  *See BMW*, 517 U.S. at 583 (finding an award 500 times the amount of compensatory damages "breathtaking" and striking the award); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1365 (11th Cir. 2004) (reducing a punitive damage award from $1,000,000 to $250,000 when compensatory damages amounted to $115.05); *Goldsmith*, 513 F.3d at 1283 (upholding a punitive damages award in a Title VII case where the award was 9.2 times the compensatory damages); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1334 (11th Cir. 1999) (upholding district court's decision to reduce punitive damages award in a case involving nuisance and trespassing in which the jury awarded $47,000 in compensatory damages and $45 million in punitive damages, and agreeing with the district court that the defendant's conduct was not severe and a ratio of 1500:1 was disproportionate); *Glover v. Ala. Dep't of Corr.*, 734 F.2d

---

[5] We note that, in light of the jury's instructions, the award of $1 could have been nominal rather than compensatory damages.

12

691 (11th Cir. 1984) (upholding punitive damages of $25,000 and compensatory damages of $1 in a case involving the stabbing of an inmate after a corrections officer commented that the inmate's life was worth only five or six packs of cigarettes), *overruled on other grounds*, 474 U.S. 806 (1985), *opinion reinstated in relevant part*, 776 F.2d 964 (11th Cir. 1985).

Here, the court stated only that there was no mathematical formula to be applied and the award was reasonable. In light of the relevant case law and the district court's statement, we cannot say that the district court properly evaluated the 99,999:1 ratio. In fact, that ratio far exceeds any that this court has upheld as reasonable.

### c. Comparable Civil and Criminal Penalties for Similar Misconduct

The third guidepost is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *BMW*, 517 U.S. at 575.

Here, the parties dispute which Florida statute presents a comparator. The district court did not identify the relevant statute or otherwise specify on what statute or case law it relied when it concluded that the amount was not excessive. This leaves us with no basis to evaluate this guidepost.

Accordingly, because the district court's order denying Gipson's motion to

13

reduce or set aside the punitive award does not provide sufficient reasoning for us to conduct a review, we vacate and remand for further proceedings. On remand, once the district court makes the requisite findings under the *BMW* guideposts, it should then address whether the amount of the award was constitutionally excessive in light of these findings and our precedent.

**VACATED and REMANDED.**